# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

DAVID R. GRIM, )
)
        Plaintiff, )
)
vs. ) Case No. 09-cv-677-TLW
)
MICHAEL J. ASTRUE, )
Commissioner of the Social Security )
Administration, )
)
        Defendant. )

## OPINION AND ORDER

      Plaintiff David R. Grim, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying his applications for disability benefits under Titles II and XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 12). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

## Review

      When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security

regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The

evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

## Background

Plaintiff was born May 22, 1956 and was 53 years old at the time of the Administrative Law Judge's ("ALJ") final decision on June 29, 2009.[1] (R. 46). Plaintiff has an eleventh grade education plus special job training in food services and "RV tech training." (R. 171). Plaintiff's prior work history consists of work as a recreational vehicle repairer (SVP 6, medium exertion, reportedly performed at the heavy level). (R. 37). Plaintiff alleges a disability onset date of December 21, 2006. (R. 142, 147).

Plaintiff had two hearings, the first held August 26, 2008 and the second May 11, 2009. The ALJ issued a decision on September 30, 2008, denying plaintiff's claim for benefits. Plaintiff appealed that decision to the Appeals Council, which remanded plaintiff's case to the ALJ with instruction to:

> Obtain additional evidence and evaluate all of the physical impairments in order to complete the administrative record in accordance with the regulatory standards. The additional evidence will include, if deemed necessary by the [ALJ], a consultative examination and a medical source statement regarding the claimant's ability to perform work-related activities despite his physical impairments.
>
> Evaluate the [plaintiff's] mental impairment in accordance with the special technique described in 20 C.F.R. §§ 404.1520a, 416.920a, documenting application of the technique in the decision by providing specific findings and

---

[1] Plaintiff's application for disability was denied initially and upon reconsideration. (R. 65-68, 84-87, 88-91). Hearings were held before ALJ Charles Headrick August 26, 2008 (R. 42-64) and May 11, 2009 (R. 17-41), in Tulsa, Oklahoma. By decision dated June 29, 2009, the ALJ found that plaintiff was not disabled at any time through the date of the decision. (R. 6-16). On September 11, 2009, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

3

appropriate rationale for each of the functional areas described in 20 C.F.R. §§ 404.1520a(c), 416.920a(c).

…

Give further consideration to the [plaintiff's] maximum residual functional capacity and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the treating and examining source opinions pursuant to the provisions of 20 C.F.R. §§ 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-5p, and non-examining source opinions in accordance with the provisions of 20 C.F.R. §§ 404.1527(f) and 416.927(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence.

…

(R. 82-83).

In his second decision, the ALJ stated that the "summary of objective medical evidence set out in the prior Administrative Law Judge decision is adopted in this decision as if set out in full in this decision; however, the findings, conclusions, and decision are not adopted." (R. 12). During plaintiff's first hearing, his attorney stated that plaintiff had suffered with back problems and pain for a number of years due to an on-the-job injury in 1991 or 1992. (R. 45). Under questioning by the ALJ, plaintiff testified that he worked at Bell Camper Sales for approximately twelve years and stopped approximately December 28, 2006, because his pain had made it too difficult to walk. (R. 48-49). Plaintiff received his back injury while performing housekeeping and maintenance work at Jane Phillips Hospital. (R. 49). Plaintiff stated that while working at Bell Camper Sales, his back "got to hurting so bad, and the sensation in [his] hips would come on so strong that [he] could not take another step, and [he] worked until [he] literally could not take another step." (R. 48).

Plaintiff claimed to be unable to afford health care and therefore did not go to the doctor often and mainly tried to control his pain with over-the-counter medications. (R. 51). He stated he attempted physical therapy, but could not continue because it was too strenuous. He claimed water therapy left him feeling as if he were "carrying two cinderblocks," and gave him a "crushing sensation" in his back. (R. 52). He mentioned that he tried massage therapy, an epidural (three injections in the spine), and a TENS unit.[2] (R. 52-53). Plaintiff also stated his primary care physician prescribed him pain medication. (R. 53).

Plaintiff attended the hearing in a wheelchair, stating he used it if he needed to go "a long distance." Id. He claimed he must use a cane to support himself "all the time around the house." Both the wheelchair and cane were not prescribed but belonged to plaintiff's father before he passed away. (R. 54).

Plaintiff testified he drives his wife to work and to the store, but does not shop. (R. 50-51). He drives his mother anywhere she needs to go. (R. 51). When questioned about his daily activities, plaintiff stated he does no housework at all, and no cooking aside from reheating food in the microwave. (R. 54-55). Plaintiff claimed his wife must help him dress at times and he has assistive devices installed in his home such as handrails in the bathroom and shower. (R. 55). He stated he spends approximately eighty to ninety percent of his day lying down or reclining. (R. 56).

Plaintiff claimed he usually sleeps three (3) or four (4) hours a night, but that some nights he does not sleep at all due to pain. (R. 57). He attempted to explain how the pain feels to the ALJ. (R. 57-58).

---

[2] TENS is an acronym for transcutaneous electrical nerve stimulation. See http://emedicine.medscape.com/article/325107-overview.

During his second hearing held May 11, 2009, plaintiff's testimony was consistent with the first hearing, being asked many of the same questions about his pain and daily activities. (R. 17-41). Plaintiff stated he can only walk approximately 20-25 feet with a cane, anything further requires the use of the wheelchair. (R. 26). Plaintiff stated that he takes Neurontin, Lisinopril, Ultram, Hydrocodone, Tylenol and aspirin. Ultram, Neurontin, and Hydrocodone are prescribed for pain. (R. 27).

Plaintiff stated he drives "a little bit in town," but that his son was moving in with him and his wife in order to do more of the driving. (R. 28).

Plaintiff described the pain in his back as "shooting up, sometimes the pain in my back will go down my legs. I [ha]ve had a few cases where I [ha]ve had pains going up into my shoulders. I [ha]ve had some pain in my left arm, but I [a]m not sure if that [i]s caused by the same thing or not, but it [wi]ll shoot down my legs like a hot wire." (R. 30). Plaintiff said that he has difficulty ambulating without a cane and that he has fallen on occasion. (R. 31-32). He also stated his sleep, a total of four (4) to six (6) hours a night, is not continuous. (R. 32). Plaintiff testified that he takes naps during the day and that his medications affect his ability to concentrate. (R. 33).

The ALJ inquired if plaintiff's weight (210 lbs) "pose[s] any problems for [him] as far as [his] ability to do things," and plaintiff stated "[n]ot that [he] can tell. [He has] lost about 12 pounds and that does [no]t seem to, seem to help much." (R. 35).

Plaintiff's medical records begin with a handicapped parking placard application dated October 3, 2007, which is signed by his treating physician, Michael Opong-Kusi, D.O. (R. 198). Dr. Opong-Kusi stated plaintiff "is severely limited in his ability to walk due to an arthritic,

neurological, or orthopedic condition." Id. Dr. Opong-Kusi requested that plaintiff be given a five (5) year placard. Id. There is another placard application dated June 18, 2007, which is signed by Muhammad Shaukat, M.D., stating plaintiff is unable to walk 200 feet without stopping to rest. The second application seeks a six (6) month placard. (R. 199).

Next, records from Jane Phillips Episcopal Memorial Medical Center, beginning in January, 1991, begin to document plaintiff's back pain history after a work-related injury. (R. 210-285). Plaintiff had a bone scan performed on January 15, 1992 (R. 261), a CT scan of the thoracic and lumbar spine on February 6, 1992 (R. 265), nerve conduction and electromyography on February 17, 1992, and a MRI of the lumbar spine on July 9, 1992 (R. 230). Each yielded normal results. Plaintiff continued to be seen for back pain. He attended physical therapy from June 17 to July 17, 1992. (R. 280-281). Still complaining of pain in his back in 1993, plaintiff received epidural injections from R. E. Kaplan, M.D. (R. 212). He was prescribed a trial of a TENS unit "for back pain" on August 4, 1992. (R. 292). Another note mentions he used a TENS unit and came in to Jane Phillips for pain medication. (R. 249).

The record is then void of medical records for plaintiff until February 28, 2007, when he was examined by Tre' Landrum, D.O. for a consultative examination. (R. 294-299). Dr. Landrum noted plaintiff's injury from 1991, recited plaintiff's history (mentioning that plaintiff had changed jobs after his injury and had worked until December, 2006), and reported plaintiff's complaint that he "just dealt with" the pain "until [the pain] got to the point he could not deal with it anymore." (R. 294). During his examination, Dr. Landrum noted plaintiff moved all extremities well, he had a slight sensory defect below his left knee, and Rhomberg and Babinski tests were negative. Dr. Landrum also noted plaintiff moved around the exam room easily, with

full range of motion of his spine. (R. 295). He noted plaintiff's straight leg raising test was negative bilaterally in seated and supine positions, yet toe and heel walking was noted as difficult bilaterally. Id. Dr. Landrum stated plaintiff "ambulate[d] with a stable gait at an appropriate speed without use of assistive devices," and assessed him with "lower back pain." Id. Dr. Landrum's evaluation of plaintiff's passive range of motion was all within normal limits, including his hands and wrists. (R. 296-298). Dr. Landrum did note slight sensory loss in plaintiff's left leg with weak heel and toe walking. (R. 299).

Plaintiff was seen at Samaritan Counseling & Growth Center on July 2, 2007 and an intake form was filled out. (R. 301-304). Plaintiff's "presenting problem" was listed as "[d]epression associated with loss of employment due to retirement by disability." (R. 301). The counselor noted plaintiff's intellectual capacity and capacity for psychological insight were both average. Id. No substance abuse was noted. Id. No formal testing was administered to plaintiff. (R. 302). A GAF score of 60 was recorded. Id. Treatment options were discussed and plaintiff decided to participate in monthly one-on-one counseling sessions. (R. 303). No notes are found after July 2, 2007, until the file was closed December 30, 2007, "due to loss of contact with client." Id.

Plaintiff was involved in an auto accident on November 15, 2007, in which he was rear-ended. (R. 306-307). He sought treatment at the Jane Phillips Medical Center emergency room on November 17, 2007, complaining of low back pain. (R. 307). He stated he did not receive any treatment at the scene. Id. He was examined and diagnosed with thoracic back strain and told to return to activity "as tolerated." (R. 308). An x-ray was ordered and found "no acute

compression fracture or subluxation defined, . . . relative preservation of the disk spaces, . . . and no paraspinal masses." (R. 314).

Plaintiff's records next show visits to his primary care physician, Dr. Opong-Kusi, for back pain. (R. 318-338). Dr. Shaukat examined plaintiff June 18, 2007, diagnosed him with chronic low back pain and high blood pressure, ordered a MRI, and prescribed tramadol. (R. 334-335). Plaintiff returned to see Dr. Opong-Kusi on August 20, 2007, complaining of low back pain with sharp pain that radiated from the gluteus to his knees and stating his pain medication was not working. (R. 331-333). Plaintiff informed Dr. Opong-Kusi that he had a MRI scheduled in September. (R. 331). During this visit, plaintiff reported "radiculopathy-type[3] pain that radiate[d] from [his] low back to [his] anterior thighs bilaterally." Id. Dr. Opong-Kusi mentioned plaintiff did not use any assistive devices to walk. Id. He also made note that a straight leg raise test produced "sharp pain in the low back" at 70 degrees. Id. Plaintiff returned to Dr. Opong-Kusi September 10, 2007 for a follow up visit. Dr. Opong-Kusi again noted straight leg raising produced pain localized to the lumbar area radiating to the anterior lateral thigh at 60 to 70 degrees. (R. 328).

Plaintiff's September 20, 2007 MRI showed an impression of "negative lumbar spine." (R. 338). Plaintiff returned to Dr. Opong-Kusi on September 25, 2007 for Dr. Opong-Kusi to explain his results. Dr. Opong-Kusi noted the MRI showed "negative lumbar spine free of disk herniation, protrusions, or spinal stenosis." (R. 325). Plaintiff reported to Dr. Opong-Kusi that he still had pain, but the prescriptions of Neurotin and tramadol both helped resolve his pain episodes. Id. Dr. Opong-Kusi noted plaintiff's bilateral upper and lower extremity strength was

---

[3] Radiculopathy is defined as disease of the nerve roots. See http://medical-dictionary.thefreedictionary.com/radiculopathy.

5/5 and he had a positive straight leg raising test "bilaterally lower extremities at approximately 70 [degrees] equals pain to low lumbar area." Id. Plaintiff was diagnosed with chronic low back pain secondary to occupational injury and radiculopathy. Id. Plaintiff was seen again for follow up for his back pain on December 3, 2007. Plaintiff reported to Dr. Opong-Kusi that he increased his dosage of Neurontin and "his pain [was] much improved." He also stated Balofen was helping him sleep at night. (R. 318). Dr. Opong-Kusi noted a straight leg raising test performed at this visit elicited pain at approximately 40 degrees, but plaintiff was able to walk without any assistive devices. Id.

Plaintiff was seen by Kenneth R. Trinidad, D.O., on January 11, 2008 for "severe back pain." (R. 354). Dr. Trinidad's examination revealed an "antalgic gait favoring his legs," tenderness and spasm from L1 through S1 bilaterally in his lumbar spine. Id. Dr. Trinidad noted a straight leg raising test produced tightness in plaintiff's legs bilaterally at 60 degrees, his lumbar flexion was 20 degrees (considered within normal range of 20-25), extension was 0 degrees, right lateral bending 10 degrees, and left lateral bending 10 degrees. Id. A neurologic exam showed plaintiff's deep tendon reflexes were symmetric, his toes were "downgoing," some weakness was shown in his legs with no sensory loss appreciated. Id. Dr. Trinidad's impressions were "lumbar strain with injury aggravated lumbar disc disease resulting from a motor vehicle accident of November 15, 2007." Id. His recommendations were: (1) Mobic once daily with food as an anti-inflammatory, (2) Lortab 10 mg every six (6) hours as needed for pain, (3) continue his muscle relaxant, (4) trial of physical therapy three times weekly at Bartlesville Rehab Center, and (5) reevaluation in two (2) weeks. (R. 354-355).

Plaintiff began physical therapy at Bartlesville Physical Rehabilitation on January 17, 2008 after suffering a rear-end auto accident. (R. 340-353). His long term goals were listed as independence in a home exercise program, decreased pain with functional activities, increased range of motion to within normal limits, and the ability to ambulate approximately 40 feet without pain increase, all within a month. (R. 343). He was to be seen three (3) times a week for four (4) weeks for water therapy. Id. The next day, January 18, 2008, plaintiff reported he did not want to stay in therapy, that he could not tolerate water therapy due to the increase in his pain level, and he was subsequently discharged the same date. (R. 345).

Plaintiff returned to Dr. Trinidad January 28, 2008 for follow up. Dr. Trinidad noted plaintiff's unsuccessful attempt at physical therapy, noting "tenderness and spasm" in the lumbar spine with restricted movement. (R. 355). He again diagnosed lumbar spine with injury aggravated lumbar disc disease, recommending plaintiff have a MRI, discontinue physical therapy, continue his medications, and he would reevaluate in two (2) weeks. Id.

Plaintiff was again seen by Dr. Trinidad on February 13, 2008, for follow up. (R. 356). Dr. Trinidad noted plaintiff's MRI showed a "small disc protrusion at L2-3. No disc herniations. He is still having a lot of pain and spasm in his back." Id. Examination revealed plaintiff to have tenderness and spasm at L4-S1 bilaterally, lumbar flexion was 30 degrees, extension 10 degrees, and lateral bending 15 degrees bilaterally. Id. Dr. Trinidad again diagnosed lumbar strain with injury aggravated lumbar disc disease, stating "[a]t this time it appears that his condition is chronic and stable. I have released him from care and will reevaluate his status on an as needed basis." Id.

A report from Tulsa Diagnostic Imaging dated January 28, 2008 shows:

L2/3: There is a small 2 to 3 mm left foraminal disc protrusion with mild inferior left foraminal narrowing. The central canal is patent.

L3/4: Disc bulging in the foramina is very subtle and facet hypertrophy is slight. The central canal and foramina is patent and there is very mild bilateral inferior foraminal narrowing.

L4/5: Disc bulging in the foramina is very subtle and facet hypertrophy is slight. The central canal and foramina is patent and there is very mild bilateral inferior foraminal narrowing.

L5/S1: No significant disc bulge is identified. The foramina are lower normal in caliber congenitally. The central canal is congenitally narrow.

(R. 357).

Plaintiff visited Dr. Opong-Kusi's clinic for a "routine checkup" on February 25, 2008. Dr. Opong-Kusi's physician's assistant, Kelly A. Lueders, reported plaintiff had been followed by pain management/neurology for approximately six (6) months, had completed his treatment with the specialists, so he will be seen there for further pain management. (R. 369-371). Ms. Lueders mentioned plaintiff "denie[d] any progression of his low back symptoms, reporting they are stable." (R. 369). She noted plaintiff's straight leg raising test during this visit was negative bilaterally. Id. Plaintiff was directed by continue Neurontin and Lortab as prescribed by previous specialists. Id.

Plaintiff again visited Dr. Opong-Kusi April 7, 2008 for a back pain follow up visit. (R. 366-368). He was assessed with chronic low back pain and musculoskeletal pain and low back radiculopathy. Dr. Opong-Kusi instructed plaintiff to continue his current medications of Neurontin, Tramadol, and Lortab, instructing him to use the Lortab judiciously for break-through pain. (R. 366).

Plaintiff was seen by Dr. Opong-Kusi October 27, 2008, where he stated his pain was making it increasingly difficult to walk, and requested a prescription for a manual wheelchair. (R. 380-382). Dr. Opong-Kusi prescribed a wheelchair and advised plaintiff to enroll in physical therapy/rehab classes at the center for patients with disability in Tulsa. (R. 382). Plaintiff returned to Morton Comprehensive Health Services (Dr. Opong-Kusi's clinic) on January 30, 2009 for a three (3) month check up and was seen by Kelly Luedera, PA-C. (R. 379-380). Ms. Luedera noted he was still using a cane to assist his walking. She also noted as to plaintiff's thoracolumbar spine: "[t]horacolumbar spine showed abnormalities. Thoracolumbar spine demonstrated tenderness on palpation. Thoracolumbar spine motion was abnormal. Thoracolumbar spine pain was elicited by motion," and of his lumbar/lumbosacral spine: "[l]umbar/lumbosacral spine exhibited abnormalities. Lumbosacral spine exhibited muscle spasms. Lumbosacral spine pain was elicited by motion." (R. 380). A March 20, 2009 MRI showed "mild OA [osteoarthritis]" and "multilevel mild foraminal stenoses" with "not much progression since previous study." (R. 377).

## Procedural History

Plaintiff alleges his disabling impairment is "back injury." (R. 167). In assessing plaintiff's qualifications for disability, the ALJ first stated plaintiff met the insured status requirements of the Act through December 31, 2011. (R. 11). Next, he determined at step one of the five step sequential process that plaintiff had not been engaged in substantial gainful activity since December 21, 2006, his alleged onset date. Id. At step two, the ALJ found plaintiff to have the severe impairment of low back pain. Id.

13

At step three, the ALJ determined plaintiff's impairments did not meet the requirements of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, 416.925, and 416.926), specifically discussing section 1.04, Disorders of the spine. Id. Before moving to the fourth step, the ALJ found plaintiff had the following residual functional capacity ("RFC"):

> … the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

(R. 12). At step four, the ALJ determined that plaintiff was unable to perform any of his past relevant work. (R. 14). At step five, the ALJ determined plaintiff had transferrable work skills from past relevant work and based on testimony from the vocational expert, was able to perform "other occupations with jobs existing in significant numbers in the national economy" such as hardware sales and meter reader. (R. 15). The ALJ concluded that plaintiff was not disabled under the Act from December 21, 2006, through the date of the decision. Id.

## Issues Raised

Plaintiff's allegations of error are as follows:

1. The ALJ failed to properly consider the treating physician's opinion,

2. The ALJ failed to properly consider the claimant's credibility; and

3. The ALJ's RFC assessment is not supported by substantial evidence.

(Dkt. # 18 at 4).

## Review of Issues

Before beginning his argument, plaintiff states the alleged errors pertain solely to the finding that he is able to walk/stand six (6) hours of an eight (8) hour day. Plaintiff does not

14

contest the "implied finding" that he can perform sedentary work because "at his age, 50 at onset date, with no transferable skills to sedentary work (T. 38) he would be entitled to benefits." Id.

Plaintiff first claims the ALJ failed to properly consider the opinion of plaintiff's treating physician, Dr. Opong-Kusi. The Court agrees with this argument, as the ALJ does not state what weight was afforded to any specific opinion evidence.

Plaintiff argues "… Dr. Opong-Kusi completed a handicap parking application on which he indicated that the plaintiff was severely limited in his ability to walk due to arthritic, neurological, or orthopedic condition. While this opinion is not on a form entitled 'Medical Source Opinion' it is still an opinion about the plaintiff's limitations." (Dkt. # 18 at 5).

In his decision, the ALJ mentions a February 10, 2009 MRI (results of which were sent to Dr. Opong-Kusi), stating the MRI showed "no central canal stenosis and a mild left foraminal stenosis secondary to the bulge at L3-L4. There was minimal disk bulging without canal stenosis and mild bilateral foraminal stenosis at L4-L5. At L5-S1 there was a mild disk bulge without central canal stenosis and mild bilateral foraminal stenosis secondary to disk bulge. Exhibit 9F." (R. 12). A review of this exhibit reveals that the ALJ failed to include the "Impression" section, which states, "1) Mild degenerative lumbar spondylosis and facet osteoarthritis; 2) Multilevel mild foraminal stenoses; and 3) Findings have mildly progressed since the previous study." (R. 373).

The ALJ cites plaintiff's April 3, 2009 exam, mistakenly stating the date as February 27, 2009 (R. 380), stating the exam "showed no dysfunction of his motor functioning and normal reflexes." This report does show this, but also notes "Thoracolumbar spine showed abnormalities. Thoracolumbar spine demonstrated tenderness on palpation. Thoracolumbar

spine motion was abnormal" and "Thoracolumbar spine pain was elicited by motion." Of the Lumbar/Lumbosacral Spine, the report states "exhibited abnormalities; [it] exhibited muscle spasms, lumbosacral spine pain was elicited by motion." Id. The ALJ failed to mention these notes.

The ALJ also mentions plaintiff's April 3, 2009 exam, stating plaintiff was diagnosed with "benign essential hypertension, obesity, lumbar radiculopathy, and chronic pain syndrome," but he left out the diagnosis of "lower back pain." Id.

Notes from Dr. Opong-Kusi and his clinic show plaintiff requested and was written a prescription for a manual wheelchair. (R. 382).

Plaintiff also argues the ALJ said "the opinion evidence was 'given full weight because it is consistent and it does not support [the plaintiff's] allegations of pain and limitations to the extent he alleges.'" (Dkt. # 18 at 5). The Court agrees, as it is completely unclear from this vague statement which "opinion evidence" the ALJ is relying upon.

The ALJ also does not mention several pieces of evidence which are favorable to plaintiff. Dr. Opong-Kusi's "opinion" that plaintiff needed a handicap placard for at least five (5) years, in conjunction with other objective medical evidence, could support plaintiff's claims of severe pain.

Based on the foregoing, it appears that the ALJ reached the correct ultimate conclusion; however, it is not the role of the Court to provide "after the fact" reasoning. Thus, on remand the ALJ should specifically identify which evidence he rejected and why, and what weight was given to plaintiff's treating physicians and any agency reviewers.

## Conclusion

The decision of the Commissioner finding plaintiff not disabled is hereby REVERSED and REMANDED as set forth herein.

SO ORDERED this 9th day of June, 2011.

_____
T. Lane Wilson
United States Magistrate Judge